MARCELA OLVERA-MORALES, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

STERLING ONIONS, INC.; ZAPPALA FARMS, LLC; ZAPPALA HOLDING COMPANY, LLC; ZAPPALA ENTERPRISES, INC.; JAMES ZAPPALA; INTERNATIONAL LABOR MANAGEMENT CORPORATION, INC.; NORTH CAROLINA GROWERS' ASSOCIATION, INC.; and DEL-AL ASSOCIATES, INC.,

Defendants.

Civ. No. 5:02-CV-1589 GLS

**CLASS ACTION COMPLAINT FOR COMPENSATORY, INJUNCTIVE, AND DECLARATORY RELIEF**



U.S. DISTRICT COURT

FILED

DEC 2 3 2002

AT_____O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

## PRELIMINARY STATEMENT

1.      Marcela Olvera-Morales, an unskilled farmworker, brings this case to vindicate her right and the rights of similarly situated women to equal employment opportunities. In 1999, when Ms. Olvera-Morales sought employment as a guestworker, the defendant employment agencies and employers deliberately steered her and other women like her into lower paying jobs with fewer benefits.  Though she and other unskilled women workers were qualified for higher paying positions with significantly greater benefits, defendants reserved those jobs almost exclusively for men.  Thousands of women workers throughout the country have been affected by the defendants' policies and practices of discriminating on the basis of sex.

2.     Ms. Olvera-Morales brings several of her claims as a class action on behalf of herself and all other similarly situated women against International Labor Management Corporation, Inc. ("ILMC"), North Carolina Growers' Association, Inc. ("NCGA"), and Del-Al Associates, Inc. ("Del-Al"), who are large employment agencies that recruit and hire workers from Mexico and elsewhere to work in the United States under the H-2A and H-2B visa programs. The H-2A and H-2B visa programs are for non-immigrant, temporary guestworkers. Ms. Olvera-Morales and the class she represents charge that ILMC, NCGA, and Del-Al, who recruited them, hired them, and placed them in H-2B positions in the United States, discriminate against female guestworkers by steering them into less desirable positions as H-2B workers and refusing to hire them for, or assign them to, more desirable positions as H-2A workers.

3.     Ms. Olvera-Morales brings several claims on her own behalf against Sterling Onions, Inc., Zappala Farms, LLC, Zappala Holding Company, Zappala Enterprises, Inc., James Zappala, ILMC and NCGA, all of whom employ, in the United States, both H-2A and H-2B workers recruited by ILMC, NCGA, Del-Al, and others. Ms. Olvera-Morales charges that these employers, who employed her as an H-2B worker, discriminated against her on the basis of sex by refusing to hire her for, assign her to, or employ her in an H-2A position because she is a woman.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; under 28 U.S.C. § 1343(d), as a case seeking relief under an Act of Congress providing for the protection of civil rights; under 42 U.S.C § 2000e-5(f)(3), as a case brought under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and under 28 U.S.C. § 1367, as a case alleging state law claims warranting the exercise of this Court's supplemental jurisdiction.

5. Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C § 2000e-5(f)(3).

## THE PARTIES

### Named Plaintiff

6. Plaintiff Marcela Olvera-Morales ("Ms. Olvera-Morales") is a woman who resides in Mexico. On or about July 20, 1999, Ms. Olvera-Morales was recruited by Defendants International Labor Management Corporation, Inc. ("ILMC"), North Carolina Growers' Association, Inc. ("NCGA"), and Del-Al Associates, Inc. to work in the United States pursuant to the H-2B visa program. She was an employee of Defendants ILMC and NCGA from July 20, 1999 until February 19, 2000. She was also an employee of Defendants Sterling Onions, Inc., Zappala Farms, LLC, Zappala Holding Company, LLC, Zappala Enterprises, Inc., James Zappala, and unnamed actor Agway, Inc. from November 1999 until February 19, 2000.

### Defendants Zappala Entities

7. Defendant Sterling Onions, Inc. ("Sterling Onions") is a company incorporated under the laws of the State of New York with its principal places of business at 1389 Curtis Co-op Road, Sterling, New York 13156 and 11404 Schuler Road, Cato, New York 13033. Its telephone numbers are (315) 564-6000 and (315) 947-5166.

8. Defendant Zappala Farms, LLC ("Zappala Farms") is a limited liability company with its principal places of business at 1389 Curtis Co-op Road, Sterling, New York

3

13156 and 11404 Schuler Road, Cato, New York 13033. Its telephone number is (315) 564-6000.

9.      Defendant Zappala Holding Company, LLC ("Zappala Holding") is a limited liability company with its principal place of business at 11404 Schuler Road, Cato, New York 13033.

10.     Defendant Zappala Enterprises, Inc. ("Zappala Enterprises") is a company incorporated under the laws of the State of New York with its principal place of business at 11404 Schuler Road, Cato, New York 13033. Its telephone number is (315) 564-6000.

11.     Defendant James Zappala is an individual residing at 11404 Schuler Road, Cato, New York 13033. His telephone number is (315) 564-6000.

12.     Defendants Sterling Onions, Zappala Farms, Zappala Holding, Zappala Enterprises, and James Zappala (together, "the Zappala Entities") are intertwined New York-based entities engaged in the business of growing, harvesting, grading, packing, storing, acquiring, and distributing onions.

13.     At all relevant times, James Zappala was the head of each of the Zappala Entities.

        a.      On information and belief, James Zappala was the President, sole owner, sole office-holder, sole shareholder, and sole director of Sterling Onions.

        b.      On information and belief, James Zappala was the President, sole owner, sole office-holder, sole shareholder, and sole director of Zappala Enterprises. On information and belief, the primary purpose of Zappala Enterprises was to be a corporate member of Zappala Farms.

4

c.    On information and belief, James Zappala was one of two members of Zappala Holding; the other member was not independent of James Zappala or the other Zappala Entities.

d.    On information and belief, Zappala Farms was run by James Zappala and was comprised of three members:  James Zappala, Zappala Enterprises, and the Zappala Family Trust.

14.    On information and belief, at all relevant times, James Zappala was the President and sole managerial employee of Empire Sweets, an onion production and distribution division of the Country Best division of the Country Product Foods Group division of Agway, Inc. ("Agway").  Empire Sweets grew, packed and distributed a brand of onions produced in New York called "Empire Sweets."  Ms. Olvera-Morales packed Empire Sweets onions.

15.    On information and belief, James Zappala conducted business for each of the Zappala Entities at the same locations in Cato and Sterling, New York.

16.    On information and belief, at all relevant times, each of the Zappala Entities maintained their business records at the same locations in Cato and Sterling, New York.

17.    At all relevant times, each of the Zappala Entities shared property, facilities, and equipment.  In addition, each of the Zappala Entities shared in the use, operation, management or ownership of housing facilities for seasonal workers.

18.    At all relevant times, the Zappala Entities grew, harvested, graded, packed, stored and distributed onions exclusively or primarily for the Empire Sweets division of Agway.

19.    At all relevant times, each of the Zappala Entities shared many of the same managers and employees and shared in the supervision of those employees.

20.     At all relevant times, the Zappala Entities employed seasonal workers under both the H-2A and H-2B visa programs. The Zappala Entities employed Plaintiff Olvera-Morales under the H-2B visa program.

21.     At all relevant times, the Zappala Entities exercised a significant degree of control over the terms and conditions of Ms. Olvera-Morales' employment, including, but not limited to, her access to employment opportunities, hiring, training, supervision, transfer, employment policies, and the means and manner of her work performance.

22.     At all relevant times, defendants Sterling Onions, Zappala Farms, Zappala Holding, Zappala Enterprises, and James Zappala were single or integrated enterprises.

23.     At all relevant times, defendants Sterling Onions, Zappala Farms, Zappala Holding, Zappala Enterprises, and James Zappala were alter egos.

**Defendants ILMC and NCGA**

24.     Defendant International Labor Management Corporation, Inc. ("ILMC") is a company incorporated under the laws of North Carolina with its principal place of business at 230 Cameron Avenue, Vass, North Carolina 28394-9116. Its telephone number is (910) 245-4808, and its facsimile number is (910) 245-3891.

25.     Defendant North Carolina Growers Association, Inc. ("NCGA") is a company incorporated under the laws of North Carolina with its principal place of business at 230 Cameron Avenue, Vass, North Carolina 28394-9116. Its telephone number is (910) 245-4808, and its facsimile number is (910) 245-3891.

26.     At all relevant times, ILMC and NCGA were intertwined entities that recruited, procured, and hired H-2A and H-2B workers, including Ms. Olvera-Morales and other

female H-2B workers, for growers, including the Zappala Entities and other entities in New York and other states.

27. At all relevant times, ILMC and NCGA employed H-2A and H-2B workers, including Ms. Olvera-Morales and other female H-2B workers.

28. At all relevant times, ILMC and NCGA exercised a significant degree of control over the terms and conditions of the employment of Ms. Olvera-Morales and other female H-2B workers. The areas of control included, but were not limited to, hiring, training, supervision, work assignments, transfers, employment policies, the workers' access to employment opportunities, and the means and manner of the workers' work performance.

29. During the relevant period, ILMC and NCGA maintained ongoing contact with Ms. Olvera-Morales and other female H-2B workers after recruiting and hiring them and continued to manage and facilitate aspects of their employment.

30. On information and belief, C. Stan Eury (also known as Craig Eury) was the President of both ILMC and NCGA and ran and operated ILMC and NCGA from the same location.

31. On information and belief, ILMC and NCGA shared resources, including staff, managers, and a network of recruiting agents, in connection with their recruitment and employment of H-2A and H-2B workers.

32. At all relevant times, ILMC and NCGA were single or integrated enterprises.

33. At all relevant times, ILMC and NCGA were alter egos.

**Defendant Del-Al**

34.     Defendant Del-Al Associates, Inc. ("Del-Al") is a company incorporated under the laws of Texas with its business addresses at 880 Flordon Drive, Charlottesville, VA 22903 and 7550 IH 10 West, Ste. 800, San Antonio, TX 78229.  On information and belief, Del Al operates largely out of San Antonio, Texas.

35.     At all relevant times, Del-Al recruited and procured H-2A and H-2B workers, including Ms. Olvera-Morales and other female H-2B workers, in concert with and on behalf of ILMC and NCGA, for growers, including the Zappala Entities and other entities in New York and other states.

## EMPLOYER AND EMPLOYMENT AGENCY ALLEGATIONS

36.     At all relevant times, Sterling Onions, Zappala Farms, Zappala Holding, Zappala Enterprises, James Zappala, ILMC, and NCGA ("the Employer Defendants") were "employers" within the meaning of Title VII of the Civil Rights Act of 1964 and under the New York Human Rights Law.

37.     At all relevant times, the Zappala Entities, ILMC, and NCGA were joint employers.

38.     At all relevant times, the Zappala Entities, ILMC, and NCGA were simultaneous employers.

39.     At all relevant times, the Zappala Entities, ILMC, and NCGA exercised a significant degree of control over the terms and conditions of Ms. Olvera-Morales' employment, and ILMC and NCGA exercised a significant degree of control over the terms and conditions of the employment of the members of the plaintiff class.

40.     The Zappala Entities, ILMC, and NCGA have an identity of interest with respect to the employer claims alleged in this Complaint.

41.     On October 1, 2002, Agway and a number of its subsidiaries, including the Country Best Products Food Group, filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. § 362(a), plaintiffs are unable to name Agway as a defendant in the Complaint at this time. Were it not for Agway's bankruptcy filing, plaintiffs would have named Agway as a defendant in this Complaint, as an employer that exercised a significant degree of control over Ms. Olvera-Morales' employment and as a joint and simultaneous employer with the Zappala Entities, ILMC, and NCGA.

42.     At all relevant times, ILMC, NCGA, and Del-Al ("the Employment Agency Defendants") were "employment agencies" within the meaning of Title VII of the Civil Rights Act of 1964 and under the New York Human Rights Law.

43.     ILMC, NCGA, and Del-Al have an identity of interest with respect to the employment agency claims alleged in this Complaint.

## CLASS ALLEGATIONS

44.     Plaintiff brings Counts II, IV, and V of this action as a class action against the Employment Agency Defendants pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

45.     The plaintiff class consists of all female H-2B workers recruited by the Employment Agency Defendants to work in the United States from the years 1999 to the present.

46. For the purpose of injunctive relief sought pursuant Federal Rule of Civil Procedure 23(b)(2), the class consists of all female workers who were or will be recruited by the Employment Agency Defendants for employment as H-2A or H-2B workers in the United States.

47. The plaintiff class is so numerous that joinder of all members is impracticable. On information and belief, the Employment Agency Defendants recruit more than three hundred women annually to work in the United States under the H-2B visa program.

48. Questions of law and fact common to all members of the class predominate over questions relating to individual members of the class. The claims set forth in Counts II, IV, and V of this Complaint apply to all members of the class and these claims do not vary with the individual factual circumstances of the class members.

49. The claims of the named plaintiff are typical of the claims of the class.

50. The named plaintiff will fairly and adequately represent the interests of the class. The named plaintiff has no claims that are adverse to the claims of the class.

51. The named plaintiff and her class are represented by Farmworker Legal Services of New York and the NOW Legal Defense and Education Fund. These attorneys are experienced in class action litigation and will adequately and fairly represent the interests of the class.

52. The Employment Agency Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

53. The prosecution of separate actions by individual class members would unduly burden the courts and create the possibility of inconsistent or conflicting decisions.

54. A class action under Federal Rule of Civil Procedure 23(b)(3) is superior to other available methods of adjudicating the claims in Counts II, IV, and V of this action because, among other reasons:

a. Common issues of law and fact, as well as the relatively small claim of each class member, substantially diminish the interest of class members in individually controlling the prosecution of separate actions;

b. Many of the class members are unaware of their rights to prosecute these claims and lack the means or resources to seek legal assistance;

c. There has been no litigation already commenced by other class members to determine the questions presented in this Complaint; and

d. A class action can be managed without undue difficulty.

## PROCEDURAL HISTORY

55. On April 18, 2000, Ms. Olvera-Morales, on behalf of herself and others similarly situated, filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on the events alleged in this Complaint.

56. On March 15, 2002 and again on or about June 24, 2002, Ms. Olvera-Morales amended her Charges.

57. On September 16, 2002 the EEOC District Director issued a Determination finding reasonable cause to believe that the defendants (who were the respondents to Ms. Olvera-Morales's Charges of Discrimination) violated Title VII of the Civil Rights Act of 1964.

58.     On September 26, 2002, the EEOC issued Right to Sue letters authorizing Ms. Olvera-Morales and the class she represents to file a lawsuit against the defendants based on the Charges of Discrimination.

## THE NATURE OF THE COMPLAINT

### The H-2A and H-2B Visa Programs

59.     The Employment Agency Defendants recruited Ms. Olvera-Morales and other female workers, and the Employer Defendants employed Ms. Olvera-Morales, to work in the United States under the H-2B temporary guestworker visa program, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b), and not under the H-2A temporary guestworker visa program, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

60.     The H-2A visa program enables aliens who reside outside of the United States to work temporarily in the United States performing agricultural labor services.  The H-2B visa program enables aliens who reside outside of the United States to work temporarily in the United States performing non-agricultural labor services.

61.     In a number of circumstances, there is little distinction between jobs classified as "agricultural" or "non-agricultural."  Many employers of farm workers classify certain employee positions as non-agricultural.

62.     Under federal law, women and men are equally eligible for H-2A and H-2B visas. There is no difference in the qualifications for these visas.

63.     Under both the H-2A and H-2B visa programs, United States employers and employment agencies apply to the United States government for authorization to hire non-immigrant aliens as temporary H-2A and H-2B workers.  Once the United States government grants permission to the employers and employment agencies to hire a

specified number of H-2A and H-2B workers, the employers and employment agencies select the non-immigrant aliens they will hire for H-2A and H-2B positions. The United States government does not select which aliens will be offered H-2A and which will be offered H-2B positions.

64.     H-2A visas offer workers many advantages over H-2B visas, including higher wages, guaranteed periods of employment, and free housing, among others.

65.     The wages for H-2A workers are typically higher than those for H-2B workers. The H-2A program requires employers to pay the highest of (i) the area and activity's prevailing wage, (ii) the state or federal minimum wage, or (iii) the adverse effect wage rate ("AEWR"), which is a rate calculated by the Department of Labor. The H-2B program requires only that workers be paid the prevailing wage for the occupation. The prevailing wage is typically significantly lower than the AEWR.

66.     H-2A workers receive greater housing benefits than do H-2B workers. Under the H-2A program, employers are required to provide H-2A workers with free housing; there is no such requirement under the H-2B program. In addition, housing for H-2A workers is required to meet minimum regulatory standards not applicable to housing for H-2B workers.

67.     H-2A workers are entitled by law to a written employment contract (or work order). H-2B workers are not entitled to, and typically do not receive, a written contract.

68.     H-2A workers receive greater work guarantees than do H-2B workers. Under the H-2A program, an employer must offer an H-2A employee work for at least three-fourths of the total workdays specified in the work order, for at least the number of hours specified in the work order. If an employer violates the three-fourths guarantee, the

employer must pay the employee the difference between the wages earned and the wages the worker would have earned if the employer had met the three-fourths guarantee. Under the H-2B program, there is no minimum work guarantee.

69. Federal regulations require employers to provide H-2A workers with free tools unless it is the prevailing practice in the area not to provide tools. There is no such requirement in the H-2B program.

70. H-2A workers receive greater transportation benefits than do H-2B workers. The H-2A program requires an employer to reimburse each H-2A worker's inbound transportation expenses from the point of recruitment to the work site, including subsistence expenses, once the employee has completed 50 percent of the contract period. Once the employee has completed the entire contract period, the employer must pay the H-2A worker's return transportation and subsistence expenses to the place of recruitment or to the worker's next job, if applicable. In addition, the employer must pay for the H-2A worker's transportation from their housing units to the work sites. The H-2B program does not require that an employer reimburse H-2B workers for transportation and subsistence expenses.

## Defendants' Recruitment, Hiring, and Employment of Plaintiffs

71. Throughout the relevant period and beyond, the Employment Agency Defendants recruited male and female workers in Mexico to work in the United States for the Employer Defendants and other employers throughout the United States under both the H-2A and H-2B visa programs. The Employment Agency Defendants simultaneously recruited workers for H-2A and H-2B jobs.

14

72. Throughout the class period and beyond, the Employer Defendants used ILMC, NCGA, and Del-Al as hiring agents for both H-2A and H-2B workers.

73. The Employment Agency Defendants recruited, and the Employer Defendants employed, unskilled workers for both H-2A and H-2B visa positions.

74. When a woman applies to be placed by ILMC, NCGA, and Del-Al in a guestworker position, ILMC, NCGA, and Del-Al almost always send the woman to work in an H-2B position and not in an H-2A position.

75. To fill H-2A positions, the Employer Defendants almost always seek male workers.

76. The members of the plaintiff class were qualified to work in both H-2A and H-2B positions.

77. Guestworkers coming to the United States generally prefer the H-2A program to the H-2B program because the H-2A program offers workers many advantages not available to H-2B workers.

78. On information and belief, both the Employment Agency and the Employer Defendants were aware of the advantages for workers of the H-2A program over the H-2B program.

79. ILMC, NCGA, and Del-Al have placed women, including Ms. Olvera-Morales, in H-2B positions in New York and elsewhere in the United States.

80. ILMC, NCGA, and Del-Al regularly place men in H-2A positions in New York and elsewhere in the United States.

81. On information and belief, at least until 2001, the Employment Agency Defendants had never placed a woman in an H-2A position in New York.

82. ILMC, NCGA, and Del-Al rarely place women in H-2A positions elsewhere in the United States. On the rare occasions when ILMC, NGCA, and Del-Al place women in H-2A positions, it is usually for work in plant nurseries.

83. The male H-2A workers recruited by ILMC, NCGA, and Del-Al had similar qualifications to Ms. Olvera-Morales and other female H-2B workers.

84. The Zappala Entities, ILMC and NCGA have hired H-2A workers to work in the onion fields and elsewhere.

85. The Zappala Entities, ILMC and NCGA employed male H-2A workers throughout the relevant period.

86. On information and belief, at least until 2001, the Zappala Entities had never hired a woman as an H-2A worker.

87. The Zappala Entities never offered Ms. Olvera-Morales a position as an H-2A worker.

88. The male H-2A workers employed by the Zappala Entities, ILMC and NCGA had similar or lesser qualifications than Ms. Olvera-Morales.

**Defendants' Recruitment, Hiring and Employment of Ms. Olvera-Morales**

89. In July 1999, the Employment Agency Defendants recruited Ms. Olvera-Morales in Mexico to work in the United States.

90. In July 1999, the Employment Agency Defendants provided Ms. Olvera-Morales with an H-2B visa to work as a temporary guestworker in the United States.

91. The Employment Agency Defendants did not offer Ms. Olvera-Morales a position as an H-2A worker. Nor did the Employment Agency Defendants inform Ms. Olvera-Morales about the H-2A visa program.

92.     Ms. Olvera-Morales was qualified to work both as an H-2A worker and as an H-2B worker.

93.     Ms. Olvera-Morales would have preferred to work in the United States as an H-2A worker rather than as an H-2B worker.

94.     On July 20, 1999, the Employment Agency Defendants sent Ms. Olvera-Morales to work as an H-2B worker in a packing shed in Michigan packing carrots.

95.     During the period from July 20, 1999 until November 1999, Ms. Olvera-Morales was an H-2B employee of ILMC, NCGA, and another entity in Michigan.

96.     Unlike H-2A workers, Ms. Olvera-Morales had to pay for her transportation from Mexico to Michigan as well as for her subsistence costs while she was traveling.

97.     In Michigan, Ms. Olvera-Morales was paid $5.15 per hour, before deductions. Ten dollars were deducted each week from her wages to pay for her housing. She did not receive an employment contract or any work guarantees.

98.     In contrast, H-2A workers received higher wages, free housing, employment contracts, and work guarantees.

99.     In November 1999, ILMC and NCGA transferred Ms. Olvera-Morales to work in a packing shed in New York packing onions for the Zappala Entities.

100.    During the period of November 1999 until February 19, 2000, Ms. Olvera-Morales was an H-2B employee of the Zappala Entities, ILMC, and NCGA.

101.    The Employer Defendants did not offer Ms. Olvera-Morales a position as an H-2A worker.

102.    In New York, the Employer Defendants paid Ms. Olvera-Morales and other female H-2B workers $6.00 per hour before deductions. The Employer Defendants also

deducted from Ms. Olvera-Morales' wages $20.00 per week for housing and $5.00 per week for transportation from the housing camps to the packing shed where she worked.

103.    During that same period, the Employer Defendants paid H-2A workers the AEWR of $7.16 per hour in 1999 and $7.68 per hour in 2000.

104.    While the Employer Defendants charged Ms. Olvera-Morales and other H-2B workers for their housing, they did not charge H-2A workers for housing.

105.    While the Employer Defendants charged Ms. Olvera-Morales and other H-2B workers for transportation to the work sites, they did not charge H-2A workers for transportation.

106.    Unlike what was required for H-2A workers, the Employer Defendants did not reimburse Ms. Olvera-Morales for her transportation and subsistence expenses from Michigan to New York or from New York back to Mexico.

107.    Unlike what was required for H-2A workers, the Employer Defendants did not provide Ms. Olvera-Morales and other H-2B workers with an employment contract.

108.    Unlike what was required for H-2A workers, the Employer Defendants did not provide Ms. Olvera-Morales and other H-2B workers with a formal work guarantee. Nor did the Employer Defendants provide them or pay them for three-fourths of the work the Employer Defendants told them they would receive.

109.    Ms. Olvera-Morales was promised work with the Zappala Entities until April 1, 2000. However, she was dismissed from her job around February 19, 2000, without completing three-fourths of the promised period. Even while she was working, the work was sporadic and she did not earn much money. She never received any pay to

compensate her for the Employer Defendants' failure to provide her with work during three-fourths of the contract period.

## CAUSES OF ACTION

## COUNT I

### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### (Against Employer Defendants)

110.    Plaintiffs repeat and incorporate paragraphs 1 through 109 of this Complaint as though set forth fully herein.

111.    This Count is brought on behalf of Ms. Olvera-Morales.

112.    Sex was a motivating factor for the Employer Defendants' decision to employ Ms. Olvera-Morales in a position as an H-2B rather than an H-2A worker.

113.    The Employer Defendants engaged in a pattern or practice of discrimination based on sex that included failure to employ female temporary guestworkers, including Ms. Olvera-Morales, in H-2A positions.

114.    The Employer Defendants' failure to employ females as H-2A workers had a disparate impact based on sex that injured Ms. Olvera-Morales.

115.    By the conduct alleged in this Complaint, the Employer Defendants unlawfully discriminated against Ms. Olvera-Morales with respect to her compensation, terms, conditions, and privileges of employment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

116.    By the conduct alleged in this Complaint, the Employer Defendants unlawfully limited, segregated or classified their employees, including Ms. Olvera-Morales, on the basis of sex, in a way that deprived Ms. Olvera-Morales of employment opportunities and

otherwise adversely affected her status as an employee, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(2).

## COUNT II

Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964
(Against Employment Agency Defendants)

117.    Plaintiffs repeat and incorporate paragraphs 1 through 116 of this Complaint as though set forth fully herein.

118.    This Count is brought on behalf of Ms. Olvera-Morales and the class she represents.

119.    Sex was a motivating factor for the Employment Agency Defendants' decision to recruit, hire, and place members of the plaintiff class, including Ms. Olvera-Morales, in positions as H-2B rather than H-2A workers.

120.    By failing to recruit, hire, or place female temporary guestworkers, including members of the plaintiff class and Ms. Olvera-Morales, in H-2A positions, the Employment Agency Defendants engaged in a pattern or practice of discrimination based on sex.

121.    The Employment Agency Defendants' failure to recruit, hire, or place females in H-2A positions had a disparate impact based on sex that injured the plaintiff class, including Ms. Olvera-Morales.

122.    By the conduct alleged in this Complaint, the Employment Agency Defendants unlawfully discriminated against plaintiffs, and classified them and referred them for employment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(b).

## COUNT III

**Sex Discrimination in Violation of the New York Human Rights Law**
**(Against Employer Defendants)**

123.    Plaintiffs repeat and incorporate paragraphs 1 through 122 of this Complaint as though set forth fully herein.

124.    This Count is brought on behalf of Ms. Olvera-Morales.

125.    By the conduct alleged in this Complaint, the Employer Defendants unlawfully discriminated against Ms. Olvera-Morales with respect to her compensation, terms, conditions, and privileges of employment on the basis of sex, in violation of Article 15 of the New York Human Rights Law, N.Y. Exec. Law § 296(1)(a) (McKinney's 2001).

## COUNT IV

**Sex Discrimination in Violation of the New York Human Rights Law**
**(Against Employment Agency Defendants)**

126.    Plaintiffs repeat and incorporate paragraphs 1 through 125 of this Complaint as though set forth fully herein.

127.    This Count is brought on behalf of Ms. Olvera-Morales and the class she represents.

128.    By the conduct alleged in this Complaint, the Employment Agency Defendants unlawfully discriminated against the plaintiff class, including Ms. Olvera-Morales, on the basis of sex, in receiving, classifying, disposing or acting upon applications for their services and in referring the plaintiffs for employment in violation of Article 15 of the New York Human Rights Law, N.Y. Exec. Law § 296(1)(b) (McKinney's 2001).

## COUNT V

Aiding and Abetting Discriminatory Practices
in Violation of the New York Human Rights Law
(Against All Defendants)

129.    Plaintiffs repeat and incorporate paragraphs 1 through 128 of this Complaint as
though set forth fully herein.

130.    This Count is brought against the Employer Defendants on behalf of Ms. Olvera-
Morales and against the Employment Agency Defendants on behalf of Ms. Olvera-
Morales and the class she represents.

131.    By the conduct alleged in this Complaint, the Employer Defendants aided,
abetted, incited, compelled or coerced others to engage in practices or conduct forbidden
under Article 15 of the New York Human Rights Law, thereby injuring Ms. Olvera-
Morales, in violation of N.Y. Exec. Law § 296(6).

132.    By the conduct alleged in this Complaint, the Employment Agency Defendants
aided, abetted, incited, compelled or coerced others to engage in practices or conduct
forbidden under Article 15 of the New York Human Rights Law, thereby injuring the
plaintiff class, including Ms. Olvera-Morales, in violation of N.Y. Exec. Law § 296(6).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

A.    Certify Counts II, IV, and V of this Complaint as a class action against the
Employment Agency Defendants;

B.    Find and declare that the acts and practices complained of in this Complaint
violate the laws of the United States and the State of New York;

C. Award Ms. Olvera-Morales all damages to which she is entitled as a result of defendants' unlawful conduct, including compensatory damages, punitive damages, and interest thereon;

D. Award the plaintiff class all damages to which it is entitled as a result of defendants' unlawful conduct, including compensatory damages, punitive damages, and interest thereon;

E. Issue an injunction directing the defendants to take such affirmative steps as are necessary to ensure that their unlawful employment practices, and the effects of those unlawful employment practices, are eliminated, including the following:

    i. Permanently enjoining defendants in this action from further engaging in the acts complained of;

    ii. Directing the defendants to provide equal opportunities to women to obtain and work in H-2A visa positions; and

    iii. Directing the defendants to ensure that female guestworkers and applicants are informed of their right to non-discriminatory employment in H-2A positions and that defendants' employees and agents provide female guestworkers and applicants with non-discriminatory work opportunities in H-2A positions.

F. Issue notice of the Court's ruling to all class members at the Employment Agency Defendants' expense;

G. Award plaintiffs their costs in this action, including reasonable attorneys' fees; and

H.    Grant plaintiffs such other and further relief as the Court may deem just and

proper.

Dated: December 20, 2002


FARMWORKER LEGAL SERVICES
OF NEW YORK, INC.

By: _____
Daniel Werner (N.D.N.Y. admission
number 510197)
52 S. Manheim Blvd.
New Paltz, New York 12561
(845) 255-1884 (tel)
(845) 255-3629 (fax)


Of Counsel:

Martha Davis, Esq.
Professor
Northeastern University School of Law
400 Huntingon Avenue
Boston, MA  02115
(617) 373-8921

NOW LEGAL DEFENSE AND
EDUCATION FUND

By: Wendy R. Weiser (by DW)
Wendy R. Weiser (WW-8580, N.D.N.Y.
admission application pending)
Jennifer K. Brown (N.D.N.Y. admission
number 510906)
395 Hudson Street, Fifth Floor
New York, New York 10014
(212) 925-6635 (tel)
(212) 226-1066 (fax)