

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
NOV 14 2003
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARCELA OLVERA-MORALES, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, )<br><br>    **Plaintiffs**, )<br><br>v. )<br><br>STERLING ONIONS, INC., ZAPPALA FARMS, LLC; ZAPPALA HOLDING COMPANY, LLC; ZAPPALA ENTERPRISES, INC.; JAMES ZAPPALA; INTERNATIONAL LABOR MANAGEMENT CORPORATION, INC.; NORTH CAROLINA GROWERS' ASSOCIATION, INC.; and DEL-AL ASSOCIATES, INC., )<br><br>    **Defendants**. ) | **SUPPLEMENTAL AFFIDAVIT OF C. STANFORD EURY, JR.**<br><br>**Civil Action No.:**<br>**02-CV-1589(NAM-GLS)** |

C. STANFORD EURY, JR. hereby declares, pursuant to 28 U.S.C. §1746, that the following facts are truthful:

1.     My name is C. Stanford Eury, Jr.  I am Executive Director of Defendant North Carolina Growers Association, Inc. ("NCGA"), and President of Defendant International Labor Management Corporation, Inc. ("ILMC"), both based in Vass, North Carolina.  I have personal knowledge of the facts stated herein.

2.     NCGA is a non-profit association that provides H-2A labor and various other services to its member growers, who are all farmers in the State of North Carolina. NCGA uses an unrelated independent contractor to recruit farm laborers (primarily from Mexico) and to assist them through the H-2A visa process.   Another unrelated independent contractor arranges transportation for them to Vass, North Carolina, where NCGA is based.  NCGA then conducts an "orientation" for the laborers before they are sent to their assigned growers.   NCGA also employs several Spanish-fluent "field representatives."  Each field representative is responsible for a number of NCGA member farms.   The field representative serves as a three-way liaison between NCGA, the grower, and the individual workers.  Field representatives are available to assist with any issues that arise between a grower and a laborer.  In addition, field representatives assist laborers with personal issues.

3.     Although the grower has primary responsibility for determining whether a worker performed satisfactorily, NCGA also has the authority in extreme circumstances to determine that a worker will be sent back to Mexico before the end of the season, *and* to determine that a worker should not return in subsequent seasons.  NCGA sometimes

becomes involved when a worker engages in some sort of misconduct. If the worker elects to leave the assignment early, the field representative frequently obtains the worker's signature on a voluntary resignation form and makes sure the worker is placed on return transportation.

4.    NCGA also provides extensive training to its member growers regarding applicable employment laws, assists with policy development, engages in political advocacy on issues of interest to its member growers, and provides growers with legal defense when necessary (and when the grower's interest does not conflict with that of NCGA). NCGA has not made a blanket admission that it is a "joint employer" with the growers, but in particular cases it has admitted to "joint employer" status if the circumstances warrant.

5.    NCGA has no involvement in the H-2B non-immigrant non-agricultural labor program, with the exception of filing one application a year for some NCGA field representatives.

6.    ILMC is a for-profit corporation that provides farm labor under both the H-2A and H-2B programs to growers in a number of states outside North Carolina. ILMC growers are "customers," not "members." ILMC is similar to NCGA in that it uses an unrelated independent contractor to recruit and process non-immigrant laborers from Mexico. ILMC uses another unrelated independent contractor to transport the workers to and from the farms in the United States. The workers are transported directly

to the growers and do not undergo orientation, either in North Carolina or anywhere else. Growers in the states of Kentucky and Tennessee obtain labor through ILMC but they also pay dues to an entity called the Kentucky Tennessee Growers Association ("KTGA"). At this point, KTGA provides no services.

7.     ILMC does not provide any supervision or "liaison" service to its customers. ILMC does not evaluate the performance or workplace behavior of the workers. ILMC does not determine – apart from reviewing visa eligibility – whether a given worker should be sent back to Mexico during the season or return to the United States in subsequent seasons. That is solely the responsibility of the customer. ILMC engages in no political activity on behalf of its customers. (KTGA has signed onto some letters to politicians.) ILMC provides no wages to its customers or to the laborers directly. (Neither, for that matter, does NCGA.) The customers are solely responsible for paying the workers' wages and providing the workers' benefits. (The laborers pay their own visa and transportation expenses.) Any issue between a worker and a grower must be resolved without the assistance of ILMC. In essence, ILMC operates solely as an independent contractor to complete the paperwork to assist growers in obtaining labor and to ensure that the workers are transported to the United States and back to their nation of origin. ILMC provides none of the other services that are provided by NCGA.

8.     Thus, NCGA and ILMC have completely distinct business purposes. NCGA is a non-profit "growers' association," serving only North Carolina growers, and providing a full range of services to its members. NCGA deals only with the H-2A

program. ILMC, on the other hand, is a for-profit entity that merely provides farm labor under both the H-2A and H-2B programs to customers for a fee. The customers are responsible for seeing that the workers return to Mexico at the end of the season.

9.    NCGA and ILMC are not in a predecessor-successor relationship. They are independent, simultaneously existing entities serving different purposes.

10.    NCGA has been a thorn in the side of Farmworkers Legal Services of North Carolina (FLS-NC) for many years and is the target of an almost continuous barrage of lawsuits and administrative charges filed by them or with their assistance. Attorney Daniel Werner has been employed with Farmworkers Legal Services of New York (FLS-NY) for several years. Given the volume of litigation to which FLS-NC has subjected NCGA, I do not believe that Mr. Werner was unable to determine until late 2002 that there was a relationship between NCGA and ILMC. The volume of deposition testimony and other material submitted by Attorney Werner in this case clearly shows that he has access to information from his colleagues at FLS-NC and that his colleagues knew that NCGA and ILMC had a relationship. For example, I have attached as Exhibit A excerpts from an article about NCGA that appeared in the October 30, 1999, edition of *The Charlotte Observer*. The article is still posted on line and can be accessed through a link provided by the FLS-NC website. The article quotes attorneys from FLS-NC and references numerous charges and lawsuits against NCGA in which the attorneys were involved. That same article accurately describes the relationship between NCGA and ILMC. The FLS-NC website provides a direct link to the *Observer* article, and the FLS-

NY website provided an indirect link. (As of the date of this affidavit, the FLS-NY link does not work.) Significantly, the FLS-NY home page states that it is "Designed and edited by *Daniel Werner*" (emphasis added), counsel for the Plaintiff. (*See* http://www.flsny.org.) Elsewhere on the FLS-NY website, there are solicitations to send material for links to Daniel Werner. A hard copy of a sample web page is are attached as Exhibit B. Thus, I can only conclude that Daniel Werner was familiar with the content of the *Observer* article.

11.     One might say that perhaps Mr. Werner did not necessarily follow all of his internet links to their final conclusions. However, in the year 2000 (two years before he tried to amend the Plaintiff's EEOC charge to add NCGA as a respondent), Mr. Werner served NCGA with a subpoena requesting, among other things, information regarding the relationship between NCGA and ILMC. A copy of the subpoena is attached as Exhibit C. This clearly shows that Mr. Werner knew or had reason to know that there was a connection between the two entities. (Mr. Werner elected not to go through with the deposition for which the information was subpoenaed.)

12.     I would like to respond specifically to some of the exhibits and information submitted with the Declaration of Daniel Werner ("Werner Decl."):

❑ **Regarding Werner Exhibits 7-12**, it is unremarkable that these documents would make no mention of NCGA because NCGA had no involvement in the recruiting or placement of the Plaintiff. These exhibits

merely demonstrate that NCGA had no involvement in the Plaintiff's employment and should not be a party to this lawsuit.

☐ **Regarding Werner Exhibit 13**, the Plaintiff testified by deposition in June 2000 – two years before she tried to amend her charge – that she spoke with "the North Carolina association." This was in the case of *Saldivar-Villavicencio v. Zappala Farms, LLC*, Index No. 00-CV-324 (N.D.N.Y.), in which Ms. Olvera-Morales was one of several plaintiffs and was represented by Mr. Werner. I find it incredible that Mr. Werner did not put two and two together and at least ask the Plaintiff what she meant by "the North Carolina association." The relevant testimony is excerpted in Exhibit D.

☐ **Regarding Werner Exhibit 14**, it becomes clear that the Plaintiff wants to have it both ways. First, her attorney says that he was unaware of the relationship between ILMC and NCGA (Werner Decl., ¶7). But then, in Exhibit 13 and Paragraph 8 of his Declaration, he submits ample evidence to indicate that he either actually knew or at least *should have known* of the relationship. He submits an excerpt from my deposition in *Villalobos v. N.C. Growers Association, Inc.*, Civil Action No. 97-1589 (D.P.R.) that was taken by Attorney Mary Lee Hall of FLS-NC in 1999. (Ms. Hall was one of the attorneys quoted in the *Charlotte Observer* article excerpted as Exhibit A.) The excerpted material clearly explains the relationship

between ILMC and NCGA, which has never been a secret. I openly admitted that I was the head of both organizations and that both entities provide non-immigrant labor under the H-2 programs. (I also explained the ways in which each entity has a distinct business purpose, as described above.)

I am not a lawyer. Maybe if I were, I would be able to understand how Mr. Werner could have had access to Exhibit 14 and yet not believe that he had information about the relationship between ILMC and NCGA. As it is, I cannot.

☐ **Regarding Werner Exhibit 15**, as stated above, NCGA and ILMC share a postage meter but have separate accounts. This information was in the original answer to the interrogatory that Mr. Werner selectively cites.

☐ **Regarding Werner Exhibit 16**, it seems to me that the Plaintiff's story in her affidavit, given in September 2003, contradicts her deposition testimony in the *Saldovar-Villavicencia* case on June 29, 2000. In her deposition testimony she testified that she spoke with someone from "the North Carolina association." *See* Exhibit D. Indeed, she admitted that she did not know the correct name of the "association." *Id.* Even Mr. Werner contends that he understood her to mean ILMC. Werner Decl., ¶7(H). Three years later, in the affidavit prepared after this lawsuit was filed, the

Plaintiff says she spoke with "Dora" from "the North Carolina Growers Association." "Dora" could only be Dora Boger, who is an employee of ILMC. Dora does not work for NCGA, and she does not answer the telephone for NCGA. Thus, Mr. Werner probably correctly interpreted the Plaintiff's testimony in June 2000 when he assumed she was referring to ILMC.

- **Regarding Werner Exhibit 17**, there is no indication in this Exhibit that I identified myself as the director of NCGA – only that the Department of Labor identified me in that capacity in their correspondence. Of course, as explained above, I am indeed the director of NCGA, so it is not surprising that they made that mistake; however, for purpose of the case, only my connection with ILMC was relevant.

- **Regarding Werner Exhibit 18**, it is true that NCGA does some very limited H-2B work, but only with respect to certain of its field representatives who have H-2B visas. NCGA does not provide H-2B laborers to its members as ILMC does for its customers.

- **Regarding Werner Exhibit 19**, the brochure was wrong. Mr. Wicker was not an employee of ILMC and never has been. He has always been an employee of NCGA only. However, Mr. Wicker was unable to speak at this event, so we never made a correction to the brochure information.

□ **Regarding Werner Exhibit 20**, as stated above, Mr. Wicker was an employee of NCGA and not ILMC; thus, the brochure (Exh. 19) is incorrect and the employee list is correct. Mr. Werner is correct that my name should have been included on the ILMC employee list. That was a mistake. I have never denied or tried to hide my involvement with ILMC, as evidenced by my deposition testimony in 1999 and other material submitted by Mr. Werner.

□ **Regarding Werner Exhibits 21-23**, the response to request for production was submitted on behalf of both NCGA and ILMC. NCGA has policies and other materials that it provides to its member growers. ILMC does not. Thus, all the documents in these exhibits were NCGA policies – they were not NCGA/ILMC "shared" policies.

13. Although there are many significant differences between the H-2A and H-2B programs, they share some characteristics. Both are non-immigrant visa programs for temporary, seasonal labor. This means that, by definition, the workers under these programs are in the United States for only a temporary period. They are authorized to stay in the United States only so long as the work assignment lasts. As soon as the work assignment ends, they must return to their nation of origin. The "seasonal" characteristic of the H-2A and H-2B visas means that the worker does not stay in the United States for years (or even a single full year) but returns to his or her nation of origin at the end of

each season or temporary period of employment. I am attaching as Exhibit E one more excerpt from the Plaintiff's June 2000 deposition in the *Saldivar-Villavicencio* case, in which she testifies that she planned to return to Mexico and affirms that Mexico is her home.

14. The original EEOC charge in this case was filed in May 2000 against ILMC. Although I was both the president of ILMC and the Executive Director of NCGA, I had no reason to believe that NCGA would be implicated in this case. If I had believed that NCGA would be implicated, I would have been deeply concerned because of the class allegations and possibly would have made dramatically different strategic decisions with respect to defense of the charge and conciliation. (NCGA places approximately 10,500 workers and sometimes considers itself their "joint employer," whereas ILMC places only approximately 4,500 workers and, most importantly, never considers itself their joint employer.)

15. Although the Plaintiff says she tried to amend her charge to add NCGA as a respondent, I never received a copy of the letter that purported to amend the charge until after the instant lawsuit was filed. When I say "I," I mean both in my capacity as president of ILMC and as executive director of NCGA. Thus, NCGA truly had no opportunity to meaningfully participate in the defense of the charge or in the conciliation process.

16.     I had no reason to believe that NCGA would be implicated in this lawsuit because the Plaintiff was assigned through ILMC to farms in Michigan and New York. As stated above, NCGA provides services only to North Carolina farmers and had no involvement with the Plaintiff or with the grower-defendants in this case.  I think the attachments to Mr. Werner's Declaration provide ample support for my contention.

17.     To the best of my knowledge, neither I nor anyone on my staff (for either NCGA or ILMC) ever told the Plaintiff, directly or indirectly, that she should deal with NCGA through ILMC.  Indeed, I am not aware of *any* dealings that NCGA had with the Plaintiff.

18.     There is one final point that I would like to make.  The Plaintiff was issued an H-2B visa in Mexico before she was assigned to her first job in Michigan in July 1999. Normally, ILMC workers are assigned to only one farm for the entire season.  However, in the Plaintiff's case, there was a crop failure, causing the Michigan grower to cancel the job before the end of the season.  Meanwhile, Zappala Farms in New York State had requested H-2A workers in 1999.  Zappala Farms had no H-2B jobs.  In an attempt to help the Plaintiff and her co-workers, ILMC sent the Plaintiff and others to Zappala Farms in November 1999.  We intended to have her visa changed from H-2B to H-2A so that she could lawfully perform the work at Zappala Farms.  (It is lawful to move her to another position before changing her visa to the appropriate classification.)  Normally, when a worker is already in the United States, the grower furnishes the necessary paperwork to ILMC, and ILMC processes the visa application.  However, in this

instance, Zappala Farms never sent the paperwork (the Plaintiff's visa and I-94 card), and so ILMC was not able to apply for an H-2A visa on her behalf. Thus, she remained on an H-2B visa while employed in New York. Sterling Onions had no H-2B certification whatsoever at the times relevant to this lawsuit. Because both Zappala Farms and Sterling Onions had requested H-2A workers and were certified only for H-2A work, ILMC had every reason to believe that it had placed the Plaintiff in H-2A jobs in New York pending her lawful reclassification as an H-2A worker.

This the _3rd_ day of November, 2003.


_C. Stanford Eury_
C. Stanford Eury, Jr.


SWORN TO AND SUBSCRIBED BY ME
This the _31st_ day of October, 2003

_B. Coe_
Notary Public
My Commission Expires: _8/5/06_

# EXHIBIT
# A

10/30/99 News Report -- Charlotte Observer (North Carolina)

---

## Desperate harvest
### N.C. growers' trade in foreign farm workers draws scrutiny
by Leah Beth Ward

\*       \*       \*

An estimated 10,000 foreign farm workers - most from Mexico and all, like Fuentes, legal immigrants - will work in N.C. fields this year in the federal H-2A program. North Carolina has become the largest user of H-2A "guestworkers" under a 1986 immigration law that allows U.S. growers to import temporary farm labor when U.S. workers are in short supply.

Fuentes' injury and the deaths in North Carolina of at least two H-2A workers since 1995 have intensified debate about the program. Farm worker advocates say H-2A workers, with fewer rights than U.S. workers and even other migrant workers, live and work under conditions that recall a similar farm worker program outlawed 35 years ago. Critics also say H-2A growers use blacklists and other tactics to keep workers silent and productive.

They cite reports from two federal watchdog agencies that conclude the H-2A program leaves workers vulnerable to health and safety risks and exploitation.

Growers' supporters in Congress are pressing a proposal that would expand the use of legal foreign farm workers. Its impact on H-2A is unclear.

In this battle, no one has more at stake than Stan Eury and the N.C. Growers Association. Eury founded it in 1989 and has built a multimillion-dollar business

that supplies foreign labor to 1,050 N.C. growers, as well as those in 16 other states, aided in part, say two federal investigations, by weak government oversight.

Eury said opponents of the H-2A program try to paint the association "as the big bad grower. But we have thrived because we are a progressive employer. This is the best thing that ever happened to farm workers," he said.

From headquarters in Vass - halfway between Sanford and Pinehurst - Eury's association and an affiliated company now control half the 30,000 H-2A workers imported each year.

In North Carolina, the association has expanded H-2A hiring to 10,500 last year from 168 in 1989. S.C. growers began using H-2A workers this year for the first time, ordering 800 from a for-profit company Eury runs called International Labor Management.

"We're serving a need," said Eury, who says that growers can't find enough U.S. workers willing to do bend-and-stoop field work.

He said H-2A workers fare better than undocumented foreign workers or U.S. migrant workers because they have workers' compensation, earn more than the minimum wage and are provided with housing and transportation.

Growers like David Sherrill of David's Produce in Ellerbe pay the association $498 per worker plus a $200 annual membership fee. Sherrill's crew members say they like working for him; more than a few H-2A workers ask to return to the same farm each year.

\* \* \*

Those who maintain that a pattern of subtle coercion underpins the H-2A program don't doubt Fuentes insisted he just needed to rest. Mary Lee Hall, a

veteran farm worker lawyer, said workers who complain about sickness risk not being invited back next season.

*    *    *

*A three-part series about North Carolina's imported "guestworkers"*

The N.C. growers association has been painted "as the big bad grower. but we have thrived because we are a progressive employer."
-- Stan Eury, founder

# EXHIBIT
# B

**FLSNY.ORG**

























LINKS: Labor Organizations Legal Services Education Health Consumer Immigration Government

In offering linked sites, FLSNY neither endorses their sponsoring organizations nor vouches for the accuracy of their information.

## Links to Farmworker Organizations.

Click a category above to view links.

If you would like your organization included in our links, please send an e-mail message to Daniel Werner.

---

# EXHIBIT C

# FARMWORKER LEGAL SERVICES OF NEW YORK, INC.

## SERVICIOS LEGALES PARA LOS TRABAJADORES AGRICOLAS

## SERVICE LEGALE POU MOUNE KAP TRAVAIL LAN FERM YO

Manheim Professional Building
52 South Manheim Boulevard
New Paltz, New York 12561
Telephone:  (914) 255-1884



November 2, 2000


International Labor Management Corporation, Inc.
230 Cameron Avenue
Vass, NC 28394-9116

Re:  <u>Elias Saldivar-Villavicencio, et al., v. Zappala Farms, LLC,
     et al.,</u> 00-CV-324 (GLS)

Dear Madam or Sir:

Attached please find a Subpoena in a Civil Case ordering you to
appear for a deposition at the offices of Legal Services of North
Carolina on December 5, 2000 at 9:30 a.m., and to produce
documents on that date.

As required by 28 U.S.C. § 1821, I have enclosed a check in the
amount of $98.00.  This amount includes an attendance fee of
$40.00 (§ 1821(b)), and $58.00 to cover mileage, tolls, and
parking (§ 1821(c)).

Very truly yours,

Daniel Werner
Attorney for Plaintiffs


Enclosure

cc:  Joseph Wallen, Esquire
     Attorney for Defendants

Issued by the
# UNITED STATES DISTRICT COURT

_____Middle_____  DISTRICT OF _____North Carolina_____

ELIAS SALDIVAR-VILLAVICENCIO, et al.

### V.

ZAPPALA FARMS, LLC, et al.

(see Exhibits A and B for full Caption)

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1] 00-CV-324(GLS)(N.D.N.Y.)

TO: International Labor Management Corporation, Inc.
230 Cameron Avenue
Vass, North Carolina 28394-9116

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Offices of Legal Services of North Carolina, 224 South Dawson Street Raleigh, North Carolina 27601 (See Exhibit A, Matters on which Examination is Requested). | December 5, 2000 9:30 a.m. |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Exhibit B, Documents or Objects to be Produced

| PLACE | DATE AND TIME |
|---|---|
| Offices of Legal Services of North Carolina, 224 South Dawson Street Raleigh, North Carolina 27601 | December 5, 2000 9:30 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiffs | November 2, 2000 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel Werner, FARMWORKER LEGAL SERVICES OF NEW YORK, INC.
52 S. Manheim Blvd., New Paltz, New York 12561  Tel. (845)255-1884

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

ELIAS SALDIVAR-VILLAVICENCIO,
JOSE MANUEL ANDRADE-AVILA,
GUADALUPE DURAN-CANDELAS, J.
AMPARO MARTINEZ-IBARRA, JUAN
MANUEL SANCHEZ-FLORES, JUAN          Case No. 00-CV-324 (GLS)
MANUEL LOPEZ-FRIAS, SALVADOR         Northern District of New York
GOMEZ- MUNOZ, CAMERINO LOPEZ-
MARTINEZ, ALFREDO SAUCEDO-
URRATIA, FERNANDO SANCHEZ-
LOPEZ, MOISES JAUREGUI-
JAUREGUI, MANUEL RAMIREZ-
SALDIVAR, LEOBIJILDO MUNOZ-
SALDIVAR, JOSE SAUCEDO-
HERRERA, JOSE ALFREDO LOPEZ-
GUZMAN, and MIGUEL ANGEL
SAUCEDO-HERRERA,

                    Plaintiffs,

          -v-

ZAPPALA FARMS, LLC, and STERLING
ONIONS, INC.,

                    Defendants.

─────────────────────────────

## MATTERS ON WHICH EXAMINATION IS REQUESTED
### (EXHIBIT A TO SUBPOENA OF INTERNATIONAL LABOR MANAGEMENT CORPORATION, INC.)

Pursuant to Fed. R. Civ. P. Rule 30(b)(6), INTERNATIONAL
LABOR MANAGEMENT CORPORATION, INC. ("ILMC") shall designate one
or more individuals to testify on its behalf. The subjects of the
deposition will include, but not be limited to, the following:

1. The nature of the relationship between ILMC and Defendants
   Sterling Onions, Inc. ("Sterling") and Zappala Farms, LLC
   ("Zappala").

2. The corporate structure, officers, directors, shareholders,
   and employees of ILMC.

3. The business associations of ILMC with other entities
   providing temporary foreign labor to employers in the United
   States.

4. All communications between any representative(s) of ILMC and
   any representative(s) of Defendants Sterling and Zappala.

1

5. Policy and procedure of ILMC with respect to the transfer of temporary foreign workers between employers using the services of ILMC and/or the North Carolina Growers Association ("NCGA").

6. Documents submitted by ILMC or NCGA to any government agency or agencies with respect to temporary foreign workers employed at the operations of Defendants Sterling and/or Zappala in 1999 and/or 2000.

7. Fee arrangements between ILMC and Defendants Sterling and Zappala, and between ILMC and temporary foreign workers employed at the operations of Defendants Sterling and/or Zappala in 1999 and/or 2000.

8. Practices of ILMC and NCGA with respect to the recruitment of temporary foreign workers in 1999 and 2000.

9. Any information with respect to the transfer of Plaintiffs Jose Saucedo-Herrera, Jose Alfredo Lopez-Guzman, and Miguel Angel Saucedo-Herrera from Zappala's operations to North Carolina.

10. Any information with respect to the transfer of Marcela Olvera-Morales from Michigan to the operations of Defendants Sterling and/or Zappala in New York.

11. Any information with respect to any applications submitted by ILMC for the extension of Marcela Olvera-Morales' temporary labor visa.

12. Any information with respect to any written or oral disclosures of the terms and/or conditions of employment provided to temporary foreign workers employed at the operations of Defendants Sterling and/or Zappala in 1999 and/or 2000.

13. Any information regarding arrangements between ILMC and Defendants Sterling and/or Zappala with respect to transportation of temporary foreign workers from their communities of origin to the work location and their return transportation from the work location to their communities of origin.

14. Any information with respect to the payment of immigration-related expenses of temporary foreign workers recruited by ILMC or its agents.

15. The nature of the relationship between ILMC and recruiters used by ILMC to recruit temporary foreign workers.

16. Any additional information in the possession of ILMC with respect to the recruitment, transportation, housing, or employment of the Plaintiffs[1] in the instant action, and of Marcela Olvera-Morales (who has been named as a Plaintiff in Plaintiffs' pending proposed amended complaint).

Dated: New Paltz, New York        Respectfully submitted,
       November 2, 2000

                                  _____
                                  Daniel Werner
                                  NDNY Bar Code # 510197
                                  FARMWORKER LEGAL SERVICES
                                      OF NEW YORK, INC.
                                  52 S. Manheim Blvd.
                                  New Paltz, NY 12561
                                  (845)255-1884
                                  Facsimile: (845)255-3629

                                  Attorney for Plaintiffs


cc: Joseph E. Wallen
    AMDURSKY, PELKY,
         FENNELL & WALLEN, P.C.
    26 East Oneida Street
    Oswego, NY 13126-2695
    (315)343-6363
    Facsimile: (315)343-0134

    Attorneys for Defendants


---

[1]  To date, the Plaintiffs in the instant action are ELIAS SALDIVAR-VILLAVICENCIO, JOSE MANUEL ANDRADE-AVILA, GUADALUPE DURAN-CANDELAS, J. AMPARO MARTINEZ-IBARRA, JUAN MANUEL SANCHEZ-FLORES, JUAN MANUEL LOPEZ-FRIAS, SALVADOR GOMEZ- MUNOZ, CAMERINO LOPEZ-MARTINEZ, ALFREDO SAUCEDO-URRATIA, FERNANDO SANCHEZ-LOPEZ, MOISES JAUREGUI-JAUREGUI, MANUEL RAMIREZ-SALDIVAR, LEOBIJILDO MUNOZ-SALDIVAR, JOSE SAUCEDO-HERRERA, JOSE ALFREDO LOPEZ-GUZMAN, and MIGUEL ANGEL SAUCEDO-HERRERA.

3

EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

ELIAS SALDIVAR-VILLAVICENCIO,
JOSE MANUEL ANDRADE-AVILA,
GUADALUPE DURAN-CANDELAS, J.
AMPARO MARTINEZ-IBARRA, JUAN
MANUEL SANCHEZ-FLORES, JUAN
MANUEL LOPEZ-FRIAS, SALVADOR
GOMEZ- MUNOZ, CAMERINO LOPEZ-
MARTINEZ, ALFREDO SAUCEDO-
URRATIA, FERNANDO SANCHEZ-
LOPEZ, MOISES JAUREGUI-
JAUREGUI, MANUEL RAMIREZ-
SALDIVAR, LEOBIJILDO MUNOZ-
SALDIVAR, JOSE SAUCEDO-
HERRERA, JOSE ALFREDO LOPEZ-
GUZMAN, and MIGUEL ANGEL
SAUCEDO-HERRERA,

Case No. 00-CV-324 (GLS)
Northern District of New York

        Plaintiffs,

        -v-

ZAPPALA FARMS, LLC, and STERLING
ONIONS, INC.,

        Defendants.

---

### DOCUMENTS OR OBJECTS TO BE PRODUCED
### (EXHIBIT B TO SUBPOENA OF INTERNATIONAL LABOR MANAGEMENT
### CORPORATION, INC.)

The documents or objects to be produced are as follows:

1.  All documents or things reflecting the nature of the
    relationship between International Labor Management
    Corporation, Inc. ("ILMC") and Defendants Zappala Farms, LLC
    ("Zappala") and Sterling Onions, Inc. ("Sterling"),
    including, but not limited to contracts, agency agreements,
    fee schedules, and/or indemnity agreements.

2.  All documents or things submitted by any representative of
    ILMC to any federal, state, local, or international
    government agency or agencies related in any way to services
    performed by ILMC for or on behalf of Defendants Zappala
    and/or Sterling.

3.  All documents or things reflecting any communication between
    any representative of ILMC and any representative(s) of
    Defendants Zappala and/or Sterling, including but not

limited to written correspondence, electronic mail correspondence, and notes or memoranda reflecting oral communications with any representative(s) of Zappala and/or Sterling.

4.  All documents or things reflecting the practices of ILMC with respect to the recruitment of temporary foreign workers in 1999 and/or 2000.

5.  All documents, lists, rosters, or compilations which reflect the names, telephone numbers, and addresses of all individuals employed, contracted, or otherwise used by ILMC for the purpose of recruiting temporary foreign workers in 1998, 1999, and/or 2000.

6.  All documents or things reflecting payments made by Zappala and/or Sterling (or any related business entity) to ILMC (or any related business entity) in 1999 and/or 2000.

7.  All documents or things in the possession of ILMC (or any related business entity) pertaining in any way to any one or number of the following persons: ELIAS SALDIVAR-VILLAVICENCIO, JOSE MANUEL ANDRADE-AVILA, GUADALUPE DURAN-CANDELAS, J. AMPARO MARTINEZ-IBARRA, JUAN MANUEL SANCHEZ-FLORES, JUAN MANUEL LOPEZ-FRIAS, SALVADOR GOMEZ- MUÑOZ, CAMERINO LOPEZ-MARTINEZ, ALFREDO SAUCEDO-URRATIA, FERNANDO SANCHEZ-LOPEZ, MOISES JAUREGUI-JAUREGUI, MANUEL RAMIREZ-SALDIVAR, LEOBIJILDO MUNOZ-SALDIVAR, JOSE SAUCEDO-HERRERA, JOSE ALFREDO LOPEZ-GUZMAN, MIGUEL ANGEL SAUCEDO-HERRERA, or MARCELA OLVERA-MORALES ("Plaintiffs").

8.  Any filings by ILMC with any state or federal agency in 1998, 1999, and/or 2000 reflecting the corporate structure, officers, directors, and/or shareholders of ILMC (this request does not include income tax returns).

9.  All printed, video, audio, or electronic instruction materials provided by ILMC to actual or prospective customers and/or clients reflecting the procedure by which these customers and/or clients may obtain temporary foreign workers for employment at their respective business entities.

10. All documents or things reflecting the policy or procedure of ILMC with respect to the transfer of temporary foreign workers between employers using the services of ILMC or the North Carolina Growers Association ("NCGA").

11. All documents or things reflecting fee arrangements between ILMC and Plaintiffs.

12. All documents or things provided by ILMC, or any representative of ILMC, to Plaintiffs with respect to their labor in the United States, including but not limited to written or oral disclosures of the terms and/or conditions of employment provided to temporary foreign workers employed at the operations of Sterling and/or Zappala in 1999 and/or 2000.

13. All documents or things related in any way to the transfer of Jose Saucedo-Herrera, Jose Alfredo Lopez-Guzman, and Miguel Angel Saucedo-Herrera from Zappala's operations to North Carolina.

14. All documents or things related in any way to the transfer of Marcela Olvera-Morales from Michigan to the operations of Sterling and/or Zappala in New York.

15. All documents or things related in any way to the termination of employment of any Plaintiff.

16. All documents or things related in any way to the Marcela Olvera-Morales' visa status while employed in Michigan or while employed at the operations of Sterling and/or Zappala, including any requests for an extension of Ms. Olvera-Morales' temporary work visa.

17. All documents or things reflecting arrangements between ILMC and Defendants Sterling and/or Zappala and/or Plaintiffs with respect to transportation of temporary foreign workers from their communities of origin to the work location and their return transportation from the work location to their communities of origin.

18. All documents or things reflecting the payment of immigration-related expenses of temporary foreign workers recruited by ILMC or its agents.

19. Any and all additional documents with respect to the recruitment, transportation, housing, or employment of Plaintiffs.

3

Dated:    New Paltz, New York       Respectfully submitted,
           November 2, 2000

Daniel Werner
NDNY Bar Code # 510197
FARMWORKER LEGAL SERVICES
    OF NEW YORK, INC.
52 S. Manheim Blvd.
New Paltz, NY 12561
(845)255-1884
Facsimile: (845)255-3629

Attorney for Plaintiffs

cc:  Joseph E. Wallen
     AMDURSKY, PELKY,
        FENNELL & WALLEN, P.C.
     26 East Oneida Street
     Oswego, NY 13126-2695
     (315)343-6363
     Facsimile: (315)343-0134

     Attorneys for Defendants

# EXHIBIT
# D



```
 1  UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF NEW YORK
 2  ------------------------------------------------------------
       ELIAS SALDIVAR-VILLAVICENCIO, JOSE MANUEL
 3  ANDRADE-AVILA, GUADALUPE DURAN-CANDELAS, J. AMPARO
    MARTINEZ-IBARRA, JUAN MANUEL SANCHEZ-FLORES, JUAN MANUEL
 4  LOPEZ-FRIAS, SALVADOR GOMEZ-MUNOZ, CAMERINO
    LOPEZ-MARTINEZ, ALFREDO SAUCEDO-URRATIA, FERNANDO
 5  SANCHEZ-LOPEZ, MOISES JAUREGUI-JAUREGUI, MANUEL
    RAMIREZ-SALDIVAR, LEOBIJILDO MUNOZ-SALDIVAR, JOSE
 6  SAUCEDO-HERRERA, JOSE ALFREDO LOPEZ-GUZMAN, MIGUEL ANGEL
    SAUCEDO-HERRERA, AND MARCELA OLVERA-MORALES,
 7
 8                              Plaintiffs,

 9            -vs-                        INDEX# 00-CV-324

10  ZAPPALA FARMS, LLC, AND STERLING ONIONS, INC

11  ------------------------------------------------------------
                           Defendants.
                 ------------------------------------------------
12                  EXAMINATION BEFORE TRIAL
                              OF
13                  MARCELA OLVERA-MORALES

14          held on June 29, 2000 at the offices of
        Amdursky, Pelky, Fennell & Wallen
15      Oswego, New York, before KAREN J. WINTER,
        Shorthand Reporter and Notary Public in and
16      for the State of New York.

17  APPEARANCES:

18      For the Plaintiffs: FARMWORKER LEGAL SERVICES OF NEW
19                          YORK, INC.
                            52 S. Manheim Boulevard
20                          New Paltz, New York 12561

21                          BY:  DANIEL WERNER, ESQ.

22      For the Defendants: AMDURSKY, PELKY, FENNELL & WALLEN
23                          26 E. Oneida Street
                            Oswego, New York 13126-2695

24                          BY:  JOSEPH E. WALLEN, ESQ.

25
```

1    A.    I don't remember how much it was, either $250 or

2    $260.

3    Q.    And what was the payment for as it was explained

4    to you?

5    A.    In Mexico it was to obtain the VISA and it was for

6    transportation from San Quez port to the boarder.

7    Q.    Did you pay any other money to Florentina?

8    A.    No, the $250 was to handle the VISA and $700

9    Mexican pesos for transportation to the boarder.

10    Q.    And who actually did the transport?

11    A.    A bus.

12    Q.    Did Florentino arrange for the bus?

13    A.    The bus, yes.

14    Q.    And do you know who Florentino was working for?

15    A.    I know that the connection was the attorney Horhey

16    Delamlamo (phonetic).

17    Q.    And who was he working for, if you know?

18    A.    He worked for the association of North Carolina.

19    Q.    And do you know what the association of North

20    Carolina was?

21    A.    I don't know the correct name of the organization.

22 .          MR. WALLEN:  That's all I've got.

23 EXAMINATION BY MR. WERNER:

24    Q.    You indicated that you received two work contracts

25    after you arrived at Sterling Onions.



1  to work with him.

2      Q.   Did you spend any money to come to New York?

3      A.   Yes.

4      Q.   How much money did you spend and what was it for?

5      A.   Transportation $75.

6      Q.   Who did you pay the $75 to?

7      A.   The bus that took us, the association, the bus

8  association.

9           MR. WALLEN:   Is this the bus station?

10     Q.   You indicated earlier that Raoul Cruz had told you

11  that you would get a VISA extension?

12     A.   Yes, he told us that they were going to extend our

13  VISAs that way we were going to be legal here, which I

14  know and saw that it was not true.

15     Q.   When did you realize that was not true?

16     A.   Seeing that my VISA extension didn't arrive, I

17  have a telephone number of the North Carolina Association

18  which I called and inquired about my VISA extension and

19  then they told me that there was a boat to arrive from

20  Mexico to them and they in turn were going to mail it to

21  me, they in turn were going to mail that to Zappala.

22     Q.   Do you remember more or less when you called North

23  Carolina Association?

24     A.   It was in the month of January and the middle of

25  January.

1       Q.    Did you call the North Carolina Association any

2    other times after that January call?

3       A.    Yes.

4       Q.    And what was that call about?

5       A.    In reference to the VISA extension.

6       Q.    When was that call made?

7       A.    After Mr. Fox told us that the work was

8    terminated.

9       Q.    Do you remember when Mr. Fox told you the work was

10   terminated?

11          MR. WALLEN:   Do you mean when the work was coming

12   to an end or when the conversation occurred.   The question

13   is susceptible of two understandings or answers.

14          MR. WERNER:   She had said the conversation

15   happened and Mr. Fox had told her that the work was over.

16          MR. WALLEN:   Do you care to rephrase the question?

17          MR. WERNER:   Is this -- sure.   Let me clean it up.

18      Q.    Do you remember the date more or less when you

19   called North Carolina Association that second time?

20      A.    I used to call the association week after week.

21      Q.    Is that week after week following your first call

22 . in the middle of January?

23      A.    Yes.

24      Q.    And what were those calls about?

25      A.    To know whether they were going to mail the VISA

1    extension.

2             MR. WERNER:  I don't have any other questions.

3    Can I do a few quick questions of the translator, is it

4    all right, two questions?

5             MR. WALLEN:  Why not.  I'll reserve all rights

6    and objections.  The Interpreter has been previously

7    sworn.

8  VOIR DIR OF INTERPRETER BY MR. WERNER:

9        Q.   Are you a native spanish speaking -- is Spanish

10   your mother tongue.

11       A.   No, Dutch is my mother tongue.

12       Q.   How long have you spoken Spanish?

13       A.   Forty years.

14       Q.   Where did you learn Spanish?

15       A.   School.

16       Q.   Where?

17       A.   In Aruba, in Holland, traveled extensively through

18   South America and Spain.

19       Q.   Was the Spanish you learned a Mexican dialect of

20   Spanish?

21       A.   No.

22       Q.   Are there -- do you recognize that there are

23   differences in dialects of Spanish?

24       A.   Yes.

25       Q.   And there may be some words of the Mexican dialect

# EXHIBIT E

1     A.    No.

2     Q.    Now, my understanding is that you're going to be

3   leaving our area fairly soon.  Can you tell me where you

4   plan on going?

5     A.    To Mexico.

6     Q.    Going back home are you?

7     A.    Yes.

8     Q.    Did you ever have a conversation with any

9   supervisor or foreman or any office people at Sterling

10  Onions about your hours of employment at Sterling Onions?

11        MR WERNER:  I'm sorry.  Was the question about

12  hours, the number of hours?

13    A.    I don't understand the question.

14    Q.    When you came to work for Sterling Onions what was

15  your understanding as to the number of hours per week that

16  you would be working?

17    A.    They didn't talk about the hours.

18    Q.    When you came to Hannibal to work at Sterling

19  Onion was there any discussion with the supervisors or

20  foremen or office people about the number of hours that

21  you were going to work per week?

22  .   A.    As far as the amount of hours, no.

23    Q.    Based on what you recall of the contract that you

24  saw when you came to Sterling Onions, do you remember any

25  mention about the number of the hours per week that you